Trust for the Benefit of Rosemary Case Weir (Formerly Rosemary Case Devens) Under the Will of Walter S. Case, Deceased, Waldron M. Ward, Mary Hadley Case and Edward A. Clapp, Trustees et al. [1] v. Commissioner. Trust ex rel. Weir v. Commissioner
Docket Nos. 31579, 31580, 31581, 31582.
United States Tax Court
1952 Tax Ct. Memo LEXIS 161; 11 T.C.M. (CCH) 662; T.C.M. (RIA) 52199; June 25, 1952
*161 Raymond B. Goodell, Esq., for the petitioners. Lester H. Salter, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income and victory tax for the year 1943 as follows: Petitioner
Docket
Deficiency
Trust for the Benefit of Rose-
mary Case Weir et al.
31579
$44,972.34
Mary Hadley Case
31580
50,703.50
Dorothy Case O'Brian
31581
43,650.90
Donald S. Case
31582
19,325.22
The petitioners in Docket Nos. 31581 and 31579 claim overpayments in income and victory tax for the year 1943. The principal question presented is whether the respondent erred in treating as "essentially equivalent to the distribution of a taxable dividend" under Section 115(g) of the Internal Revenue Code amounts paid by Case, Pomeroy & Company, Inc. in 1943 to some of its stockholders upon surrender by them to it of shares of its common stock. Other issues raised need not be dealt with unless the foregoing question is answered in the negative. Findings of Fact A stipulation of facts filed by the parties is hereby adopted and incorporated herein by reference. Waldron M. Ward, Mary Hadley Case and Edward A. Clapp, the petitioners in Docket No. 31579, were during 1943 the trustees *162 of a testamentary trust under the wil land codicil thereto of Walter S. Case for the benefit of Rosemary Case Weir (formerly Rosemary Case Devens and theretofore Rosemary Case), who is the daughter of Walter S. Case. Mary Hadley Case, the petitioner in Docket No. 31580, is the widow of Walter S. Case and a resident of Essex Fells, New Jersey. Dorothy Case O'Brian (formerly Dorothy Case Beirne and theretofore Dorothy Case), the petitioner in Docket No. 31581, is the daughter of Walter S. Case and a resident of Mount Kisco, New York. Donald S. Case, the petitioner in Docket No. 31582, is the son of Walter S. Case and a resident of San Fernando, California. The petitioners in Docket Nos. 31579 and 31580 filed their income tax returns for 1943 with the collector of internal revenue for the fifth district of New Jersey. The petitioners in Docket Nos. 31581 and 31582 filed their income tax returns for the same year with the collector of internal revenue for the second district of New York. Case, Pomeroy & Company, Inc. (hereinafter referred to as the "company") is a corporation organized under the laws of Delaware in 1936. The company is the result of a consolidation effective June 30, 1936 *163 of a predecessor New York company of the same name (organized in 1919) and the wholly-owned subsidiaries of the latter. The earned surplus of the predecessor company and its wholly-owned subsidiaries at the date of the consolidation which became reflected in the surplus account of the company amounted to $4,259,720.77. Until 1929, the common stock of the predecessor company had been closely held. On December 31, 1928 it was held by Realty & Securities Corporation, a corporation controlled by Jeremiah Milbank, which owned 46 per cent of the 1,000 shares of common stock outstanding, Louise S. Pomeroy, a sister-in-law of Jeremiah Milbank, who owned 10 per cent, Harry A. Richards who owned 5 per cent, and Walter S. Case who with his children owned 39 per cent. The first major change in stockholdings of the predecessor company occurred in 1929, when, by the capitalization of $2,400,000 of earnings, the common stock of the predecessor company was changed from 1,000 shares of the par value of $100 per share to 500,000 shares of the par value of $5 per share and the number of stockholders was increased to approximately 40 by the sale to three investment companies, i.e., Tri-Continental Corporation, *164 The Raybarn Company, Inc. and Equity Shares, Inc. and to business friends and acquaintances of Walter S. Case of all but 500 shares (as recapitalized) of the common stock theretofore owned by Realty & Securities Corporation and Louise S. Pomeroy. In 1930, after these transactions had been completed, Walter S. Case and his family owned directly and indirectly 39.1 per cent of the common stock. Walter S. Case died on October 5, 1937. The number of shares of the common stock of the company owned directly and indirectly by him and members of his family at the time of his death was 188,925, or 42.465 per cent of the then outstanding 444,891 shares. He then owned directly or indirectly 153,172 shares. He left a will pursuant to the terms of which his residuary estate was divided into five parts, one of which was transferred to each of five trusts for the benefit, respectively, of his widow, Mary Hadley Case, and of each of his four children, Hadley Case, Donald S. Case, Dorothy Case, and Rosemary Case. Under the terms of the will each trust became entitled to receive 30,634 shares of common stock. The will provided that when each of the children reached the age of thirty, the trustees should *165 transfer the corpus to such child, and when the youngest child reached the age of thirty, the trustees should transfer to his wife the corpus of her trust. However, as each child in fact reached the age of thirty, the trustees did not always deliver the corpus promptly to the beneficiary entitled thereto, and the trust was permitted to continue for a period thereafter. The trustees of each of the testamentary trusts were Mary Hadley Case, Waldron M. Ward, and Edward A. Clapp. In 1937, at the date of the death of Walter S. Case, the company had approximately 70 holders of common stock. At that date, 55,109 shares of the common stock of the company were held in its treasury, these shares having been purchased by the company in 1936 from Tri-Continental Corporation, an investment trust, at $11.085 per share. In December 1938, as the result of the distribution to their shareholders by two investment trusts, Equity Shares, Inc. and The Raybarn Company, Inc. of 122,664 shares of the company's common stock held by these trusts, the number of stockholders increased to more than 2,500, many of whom held a very small number of shares. In 1939, after the distribution of the company's common stock *166 by the two investment trusts to their shareholders, there was some market in the stock over the counter, but the volume of sales made and amounts of shares sold were small. Shareholders who desired to sell substantial blocks of stock usually came to the company to inquire whether it would buy their shares. The first purchases of its shares by the company, other than the purchase made in 1936 from Tri-Continental Corporation, were made in 1938, when two lots, each of 5,000 shares, were acquired, one in April for $7.575 per share and the other in October at $7.50. Other than these three purchases to 1936 and 1938, the company purchased no shares of its stock until after the 122,664 shares owned by the investment trusts had been distributed to the stockholders of these trusts in December 1938. Beginning with January 1939, the company began to purchase shares from individuals, brokers and others, the aggregate number of shares purchased in each of the years 1939, 1940, 1941 and 1942 being, respectively, 34,285, 26,609, 33,715, 16,627, at prices for blocks of 4,000 or more, ranging from a high of $7.00 to a low of $5.50. None of these shares was acquired from any member of the Case family. *167 Except for the invitation to tender, hereinafter described, and in the case of Tobacco Securities Trust, a foreign investment trust in London which held 25,000 shares which the company bought in various instalments, the company did not make any approach to individual stockholders to sell their stock, and had never at any time invited tenders or considered doing so. The negotiations which led to the acquisition of stock by the company generally consisted of approaches to the company by executors of estates or by individuals who would ask the company if it were interested in buying their stock or by brokers who made offers to sell shares. In most cases, especially the larger lots, a great many of which came from estates, all the stock held by the seller was acquired by the company. When its common stock could be bought at a price that was substantially under its book value, the company was interested in acquiring shares offered for sale because any purchases by it at such a price was regarded as enhancing the value of the remaining shares by improving the book value of those shares. On April 11, 1938, Donald S. Case created two trusts to each of which he assigned an undivided one-third *168 interest in the testamentary trust for his benefit. The trustee of each trust was the Bank of New York and Trust Company (hereinafter referred to as the "Bank of New York"). One of these trusts was a trust for the benefit of himself and his lawful issue. The other was a trust for the benefit of his wife, Cornelia B. Case (from whom he was later divorced), for life with remainder to their issue. In the year 1939 Hadley Case attained the age of thirty and became entitled to the shares held by the testamentary trust for his benefit; they were delivered to him by the trustees in 1939 and 1941. Hadley became active in the affairs of the company. In 1940, the testamentary trustees sold 50,000 shares of the company's stock at $8 per share, 12,500 being sold by each of the four remaining trusts for the benefit of Mary Hadley Case, Rosemary, Dorothy, and Donald. None of such shares was sold to the company. Of such shares, 32,000 were sold to Hadley Case and 8,000 to Julie M. Case, the wife of Hadley. The purchaser of 10,000 of the shares was one Benjamin Brewster, who was not a member of, or related to, the Case family. Brewster was contemplating active association with the company; he was *169 not interested in an investment limited to 10,000 shares, but preferred to wait until after he had served with Hadley Case in the company for a period of a year to determine whether to make a larger investment. The aforesaid sale of 50,000 shares of the company's stock was made pursuant to an agreement dated April 6, 1940 which provided that the obligation of each of the purchasers, including Brewster, to purchase the stock should be subject to termination at the election of the purchaser unless concurrently with such purchases an option provided for in the agreement was granted to Brewster to buy an additional 30,000 shares of the company's stock from the trustees at $8.25 per share within one year. On May 29, 1940, pursuant to the terms of the said agreement, the trustees granted such an option to Brewster. Also, as a condition of the sale, an agreement was executed on April 9, 1940, pursuant to which all shares retained by the trustees were deposited in a voting trust of which Hadley Case was voting trustee. In 1941, when the option granted to Brewster was about to expire, the trustees were still desirous of effecting a sale of the additional 30,000 shares to him, but, in view of *170 current world and business conditions, Brewster was unwilling to purchase the shares at $8.25 per share; he offered, however, to purchase 30,000 shares at $7 per share. The offer was accepted by the trustees on April 25, 1941. The agreement was approved by the Orphans' Court of Essex County, New Jersey on May 8, 1941, but on May 9, 1941, before the purchase of the stock could be completed, Brewster was suddenly killed in an airplane accident. Under the terms of the agreement, Brewster's executors chose not to purchase the stock but, instead thereof, paid a sum stipulated in the agreement as liquidated damages. Except for the sale of 50,000 shares in 1940 and the agreement for the sale of 30,000 shares to Brewster in 1941, which was never carried out, the trustees had had no other real opportunity to sell any substantial part of the shares of the company held in the trusts. Donald attained the age of 30 years in 1941, at which time he became entitled to receive the res of the testamentary trust for his benefit. In 1941, the trustees of the testamentary trust for his benefit delivered to the Bank of New York as trustee of the 1938 trust for the benefit of Donald and his lawful issue *171 6,045 shares of the common stock of the company, and at the same time delivered to the Bank of New York as trustee of the 1938 trust for the benefit of Cornelia B. Case 6,045 shares of the common stock of the company. After the delivery of the aforesaid shares to the Bank of New York, there remained in the testamentary trust for the benefit of Donald 6,044 shares of the common stock of the company. The assets of the testamentary trusts were such as would have been converted in large part into more conservative investments by most trustees. In seeking to dispose of a substantial portion of the stock held by them, the trustees were influenced in part by the claim of the Treasury for a large estate tax deficiency. After Brewster's death, the pressure upon the trustees to find a buyer for a substantial block of the stock became somewhat greater because of the assertion of this claim for additional estate tax. The trustees were familiar with the company's affairs and were cognizant of the fact that the company was making purchases of its common stock from time to time under conditions that were satisfactory to the management. Hadley Case knew of the trustees' desire to dispose of an additional *172 block of the company's stock. On March 23, 1943, during a conference between him and Waldron M. Ward, with reference to other matters, he proposed that the company might purchase 40,000 shares from the trusts. Attorneys for the company were of the opinion, however, that all stockholders should be given an opportunity to sell and that it was advisable to proceed by way of inviting tenders. The factors which guided them to this conclusion were the comparatively large amount of stock involved, the fact that one of the testamentary trustees was a director of the company, and a pending application before the Securities & Exchange Commission for exemption from registration under the Investment Act of 1940. They thought it better for the company, during the time that its status was uncertain, to proceed in the same manner it would have proceeded if it had been subject to the Act. A special meeting of the board of directors of the company was held on May 20, 1943. At that meeting Hadley Case informed the directors that the testamentary trustees were willing to sell to the company 40,000 shares of its stock at $6.75 per share and expressed the opinion that the company should acquire and purchase *173 this stock. He also recommended that all stockholders of the company be given an opportunity to tender shares for purchase at the same price. He stated that in his opinion such a purchase of stock would be advantageous, inasmuch as the estimated book value of the stock considerably exceeded $6.75 per share; that such book value would, therefore, be increased by the purchase of stock at $6.75 per share; that no such number of shares could be purchased by the company in the open market except at a cost of considerably more than $6.75 per share; and that the company, if such purchase be made, would have resources and working capital remaining adequate to carry on its business. After discussion, the directors at this meeting adopted the following resolutions: "WHEREAS, this corporation has a surplus in excess of $405,000; and in the judgment of the directors, the corporation has net resources sufficient to enable it to carry on its business after expending approximately $405,000 in the acquisition of shares of its own capital stock at a price not exceeding $6.75 per share; and "WHEREAS, the trustees of certain trusts have indicated their willingness to sell to this corporation Forty Thousand *174 (40,000) shares of its capital stock at the price of $6.75 per share; and the stock proposed to be sold to the corporation by such trusts constitutes part of the holdings in trust for certain members of a group which, individually or through trust holdings, owns in the aggregate a majority of the outstanding capital stock of this corporation, and "WHEREAS, in the judgment of its directors, this corporation should afford an opportunity to all its stockholders to tender stock to the corporation at $6.75 per share, and should purchase, if so much be tendered, up to 60,000 shares of its stock at $6.75 per share, including so much of the stock to be tendered by the said trusts as is accordingly purchased, (except so far as that number may be exceeded as a result of accepting tenders of 10 shares or less, as hereinafter provided); the total purchases to be subject to ratable reduction in the event that more than 60,000 shares be tendered; but that amounts of 10 shares or less tendered by holders of 10 shares of stock, or less, on the selected record date be first accepted in full; "NOW, THEREFORE, be it, and it hereby is "RESOLVED: That the president and the proper officers of this corporation *175 be, and they hereby are, authorized to expend a sum not exceeding approximately $405,000 of the corporation's funds in the purchase of capital stock of the corporation at the price of $6.75 per share, such purchase to be made out of stock tendered by the stockholders for purchase in accordance with these resolutions; and further authorized to invite each of the holders of the capital stock of the corporation of record on the date when such invitation is mailed to tender capital stock to the corporation for purchase by it at the price of $6.75 per share; and to issue to such holders of record an invitation to tender capital stock for purchase, accompanied by appropriate instructions and by a form of letter of transmittal, in such form as he may be advised; and be it further * * *
"RESOLVED: That such invitations to tender shall state that all stock tendered will be accepted and paid for at $6.75 per share up to a total number of 60,000 shares and up to a total purchase price of $405,000, except that amounts of 10 shares or less tendered by holders of 10 shares or less on such record date shall be accepted in full; and except that the number of 60,000 shares and the amount of $405,000 *176 may be exceeded as a result of accepting such tenders of 10 shares or less; but that if a greater number of shares than 60,000 be tendered, then purchase shall be ratably reduced in proportion to the number of shares tendered by each stockholder (subject to the purchase in full of lots of 10 shares or less, as above defined); that such ratable reduction, however, if made, shall be to the nearest whole share in the case of each shareholder, no fractional shares to be purchased; and be it further * * *
"RESOLVED: That any and all shares which may be acquired by the corporation hereunder by tender and purchase, and also all shares of its capital stock hitherto purchased by this corporation, be held in its treasury subject to sale or other disposition in the future, as may be determined by the directors, and that the capital stock of the corporation shall not be reduced by reason of any such purchase; and that it is not the intention of the corporation to effect any such reduction; * * *" Pursuant to the foregoing resolutions of the directors, an Invitation to Tender Capital Stock was made by the company on May 28, 1943 to its stockholders. The invitation advised the stockholders of the *177 contents of the resolutions which had been adopted (including the preambles), and notified them that the company would receive until June 19, 1943 tenders from its stockholders for sale to it of all or any part of their holdings at the price of $6.75 per share, with the same limitations on the number of shares that would be accepted as were specified in the resolutions authorizing the tenders. At the date of the invitation to tender the 500,000 authorized and issued shares of stock were held as follows: Shares beneficially owned directly or in-
directly by members of the Case fam-
ily
178,925
Shares owned by approximately 1,650
shareholders not related to the Case
family
144,430
Shares held in the treasury of the com-
pany
176,645
Total
500,000 Of the 178,925 shares owned by the Case family, 71,224 shares were owned by Hadley Case. The remaining 107,701 shares owned by the Case family had been deposited with and stood in the name of Hadley Case as trustee of the voting trust dated April 9, 1940. The following table shows the ownership of the voting trust certificates for the 107,701 shares at the date of the invitation to tender (Column A), the shares tendered and sold to the company on behalf *178 of members of the Case family (Column B), and the shares retained (represented by voting trust certificates) after the sale to the company (Column C): Shares
A
B
C
held
sold
retained
Testamentary trusts for benefit of: Mary Hadley Case
18,134
10,000
8,134
Dorothy Case
18,134
10,000
8,134
Rosemary Case
18,134
10,000
8,134
Donald S. Case
6,044
3,334
2,710
Bank of New York as trustee under trust created by Donald
S. Case in 1938 for the benefit of himself and his lawful
issue
6,045
3,333
2,712
Bank of New York as trustee under trust created by Donald
S. Case in 1938 for the benefit of his first wife, Cornelia B.
Case, for life with remainder to their lawful issue
6,045
3,333
2,712
(Total holdings of trusts, 72,536)
Mary Hadley Case
1,395
1,395
Dorothy Case
8,590
8,590
Rosemary Case
8,590
8,590
Wardron M. Ward and Mary Hadley Case as trustees of
trust created by Donald S. Case on May 26, 1936 for his
own benefit
8,590
8,590
Julie M. Case, wife of Hadley Case
7,000
7,000
Trustees of several trusts for the benefit of the children of
Hadley Case
1,000
1,000
Totals
107,701
40,000
67,701 No other class of stock was at that time outstanding. As a consequence of the deposit of the shares in the voting trust, none of the members of the Case family or the *179 trustees for them, with the exception of Hadley Case, possessed any voting power over the shares of the company at the time of the tender and sale. Pursuant to the invitation to tender, 40,000 shares in the aggregate were tendered by the testamentary trustees and by the Bank of New York as trustee of the trusts created by Donald S. Case in 1938. Only 2,170 shares were tendered by 178 other stockholders who were not in any way related to the Case family. In the aggregate 42,170 shares were tendered and acquired by the company out of the total of 60,000, tender of which the company had invited. Except for the tender of 1,000 shares by one of the 178 shareholders, the number of shares tendered by the 178 other stockholders ranged from 1 share to 96 shares. On June 19, 1943, the company acquired the aforesaid 42,170 shares at $6.75 per share as follows: Testamentary trust for the benefit of Mary Hadley Case
10,000
$67,500.00
Testamentary trust for the benefit of Dorothy Case
10,000
67,500.00
Testamentary trust for the benefit of Rosemary Case
10,000
67,500.00
Testamentary trust for the benefit of Donald S. Case
3,334
22,504.50
1938trust created by Donald S. Case for himself and his lawful issue
3,333
22,497.75
1938 trust created by Donald S. Case for Cornelia B. Case for life
with remainder to their lawful issue
3,333
22,497.75
178 other stockholders
2,170
14,647.50
Totals
42,170
$284,647.50
*180 The percentage of total outstanding shares held by each of the trusts from which shares were acquired pursuant to the invitations to tender before the acquisition of such shares and immediately after the acquisition of such shares was as follows: Before
After
Testamentary trust for the benefit of: Mary Hadley Case
5.608%
2.893%
Dorothy Case
5.608%
2.893%
Rosemary Case
5.608%
2.893%
Donald S. Case
1.869%
.964%
1938 trust created by Donald S. Case for himself and his lawful issue
1.870%
.964%
1938 trust created by Donald S. Case for Cornelia B. Case for life
with remainder to their lawful issue
1.870%
.964%
Totals
22.433%
11.571%
Immediately prior to the invitation to tender, the approximate number of shareholders of the company was 1,650 and immediately after the acquisition of the shares pursuant to tender, the approximate number of shareholders was 1,470. As a result of the acquisition of shares by the company pursuant to the invitation to tender, the number of shares held in the treasury of the company rose from 176,645 to 218,815. Federal stock transfer taxes were paid upon the transfer to the company of the shares acquired by the company pursuant to the invitation to tender. The shares of its common stock *181 acquired by the company from 1936 to 1950, inclusive, including the 42,170 shares acquired on June 19, 1943, have since their acquisition been continuously held by the company as treasury stock. The company's intention was to hold the purchased shares in the treasury. The balance sheet of the company as at May 31, 1943 was as follows: RESOURCES
Cash
$ 796,600.77
Domestic Securities - at cost *
$1,776,567.32
Foreign Investments - at cost
535,034.04
Ventures - at cost
$2,138,671.65
Less Reserve
181,900.00
1,956,771.65
4,268,373.01
Petroleum Properties, including Water Plant and Equipment at cost less Depletion
and Depreciation based on cost
1,637,818.40
Other Resources: Accounts Receivable
$ 79,833.02
Notes Receivable
$ 53,018.91
Less Reserve
50,000.00
3,018.91
Dividends Receivable and Interest Accrued
11,925.00
Deferred Charges
1,824.25
Office Equipment
100.00
96,701.18
$6,799,493.36
LIABILITIES
Accounts Payable including Accruals
$ 116,925.88
Deferred Income
14,597.81
Notes Payable
860,000.00
Reserve for Taxes
25,105.01
Estimated Current Tax Liability
Provision for Contingent Deferred Compensation
43,400.00
CAPITAL STOCK AND SURPLUS: Common Stock: Issued
500,000 shs.
$2,500,000.00
Held in Treasury
176,645 shs.
883,225.00
Outstanding
323,355 shs.
1,616,775.00
Surplus
4,122,689.66
5,739,464.66
$6,799,493.36
*182 The book value of the shares of common stock of the company computed upon the basis of the balance sheet as at May 31, 1943 was $17.75 per share. The book value of the shares of the company, after adjusting this balance sheet to give effect to the acquisition by the company on June 19, 1943 of 42,170 shares of its common stock at $6.75 per share, was $19.40 per share. Between the date of the invitation to tender and June 18, 1943, inclusive, the company acquired no shares of its common stock. Dorothy attained the age of 30 years on July 26, 1943, upon which date she became entitled to receive the 8,134 shares of the common stock of the company which then remained in the testamentary trust for her benefit. These shares were delivered to her by the testamentary trustees in 1944. Rosemary attained the age of 30 years in 1945, at which date she became entitled to receive 8,134 shares of the common stock of the company which then remained in the testamentary trust for her benefit. These shares were delivered to her by the testamentary trustees in 1947. When these shares were received, the number of shares owned by her totalled 16,724, as she then owned 8,590 *183 shares which had been acquired by her prior to January 1, 1939. At the date when Rosemary attained the age of 30 years, Mary Hadley Case became entitled to receive the 8,134 shares of the common stock of the company which then remained in the testamentary trust for her benefit. These shares were delivered to her by the testamentary trustees in 1947. She then owned 9,529 shares, 1,395 of which had been acquired by her prior to January 1, 1939. In 1944. Dorothy sold 7,500 shares of the company's common stock, being part of the 8,134 shares delivered to her by the testamentary trustees in that year. Of such shares, 5,000 were sold to Hadley Case at $10.50 per share, and 1,000 to Julie M. Case, the wife of Hadley, at $10.50 per share. Thereafter, in 1944, Hadley sold 5,000 shares to his wife at $10 per share. Dorothy sold the remaining 1,500 shares to others not related to the family at $10.50 per share. After the sale of the 7,500 shares Dorothy continued to own 634 of the shares she had received from the trust and 8,590 shares she had acquired prior to January 1, 1939. These 9,224 shares were acquired by the company in 1949 at $22 per share; since then Dorothy has held no shares of the *184 company's stock. In 1944, the company acquired from the Bank of New York as trustee of the two trusts created by Donald in 1938 all of the shares remaining in the trusts, and thereafter the trusts created by Donald in 1938 have held no shares of the company's stock. The company acquired 2,712 shares from each trust at $10.50 per share. In 1945, the company acquired from the trustees of a trust created by Donald for his own benefit in 1936 (for a term of ten years) 6,300 shares of the common stock of the company at $14 per share, after which this trust continued to hold 2,290 shares. Thereafter, in 1945, these 2,290 shares were delivered to Donald by the trustees and by him delivered to Security First National Bank of Los Angeles as trustee of a trust created by him in 1945. Also in 1945, the testamentary trustees of the trust for the benefit of Donald delivered to him the 2,710 shares of the common stock of the company which remained in that trust; he thereupon delivered these shares to Security First National Bank of Los Angeles as trustee of the trust created by him in 1945. This trustee thus became the holder of 5,000 shares of the common stock of the company. In 1948, the company *185 acquired from this trustee 4,000 shares of the common stock of the company at $25 per share, after which there remained in the 1945 trust 1,000 shares of the company's common stock which the trust continues to hold. Mary Hadley Case continues to own 9,529 shares. Rosemary continues to own 16,724 shares. The company has not at any time acquired any shares of the common stock of the company from Hadley Case or from Julie M. Case or from the trusts for the benefit of the children of Hadley Case. Neither Hadley Case nor Julie M. Case nor any of the trusts for the benefit of the children of Hadley Case has acquired any shares of the company since 1945, at the end of which year Hadley Case owned 68,199 shares, Julie M. Case owned 12,585 shares, the children of Hadley Case owned directly in the aggregate 740 shares and the trusts for the benefit of the children of Hadley Case owned in the aggregate 3,700 shares. The number of shares of its stock acquired by the company during the year 1944 was 24,378; 1945, 13,537; 1946, 13,939; 1947, 25,156; 1948, 15,897; 1949, 11,373; and 1950, 3,904. At the end of 1950, it had 810 shareholders, and members of the Case family owned either directly or indirectly *186 65,317 per cent of its stock. The company and its predecessor were engaged in the production and sale of oil, the management of so-called "business ventures" and the supervision of security holdings. The activities of the company and its predecessor in the oil business date back to 1920. Through its subsidiary, Petroleum Reclamation Corporation, the predecessor company became a pioneer in the secondary recovery of oil by means of water repressuring. The company is known in the oil world as a leading authority and expert in the field of secondary recovery of oil. Its primary business is the operation of its oil business. At the end of 1944, the company and its wholly-owned subsidiaries owned approximately 4,100 acres of producing leases, 183,000 acres of non-producing leases, 3,000 acres of producing royalties and 18,000 acres of non-producing royalties and, during the year ended June 30, 1944, produced approximately 550,000 net barrels of oil at Bradford, Pennsylvania, and in Illinois and Indiana. The company is also engaged in supplying water to oil concerns in the Bradford, Pennsylvania, field for water repressuring operations. There is no uniformity from year to year as to the amount *187 of working capital required in the oil operations or other operations of the company. It found it necessary from time to time to borrow money in substantial amounts. The more attractive opportunities in mining and oil usually require a large amount of money to be available and are not the type of things upon which the greater part of the money needed can be borrowed at the initial stage. In the purchase and development of its petroleum reclamation division, the company and its predecessor invested over $8,000,000. The net profit and loss and dividends paid for each of the years from the organization of the predecessor company on March 1, 1919 to June 30, 1950 were as follows: Dividends Paid
Net Profit
Preferred
Common
or (Loss)
Stock
Stock
Period March 1 - Dec. 31, 1919
380,981.75
35,000.00
75,000.00
Calendar year 1920
(107,924.06)
60,000.00
Calendar year 1921
(100,329.29)
Calendar year 1922
313,981.87
Calendar year 1923
(340,898.35)
Calendar year 1924
847,239.65
Calendar year 1925
1,098,218.10
300,000.00
Calendar year 1926
749,385.54
60,000.00
188,000.00
Calendar year 1927
225,429.19
60,000.00
Calendar year 1928
635,160.36
60,000.00
562,729.20
Calendar year 1929
4,201,307.39
95,450.00
50,000.00
Calendar year 1930
(409,628.54)
119,000.00
Calendar year 1931
(53,858.56)
119,000.00
Calendar year 1932
(279,522.91)
119,000.00
Calendar year 1933
123,976.67
119,000.00
Calendar year 1934
153,844.73
119,000.00
Calendar year 1935
193,782.72
119,000.00
150,000.00
Period January 1 - June 30, 1936
262,275.61
89,250.00
100,000.00
Fiscal Year Ended
June 30, 1937
1,152,999.45
119,000.00
311,423.70
June 30, 1938
292,781.34
93,493.75
220,945.50
June 30, 1939
22,752.18
11,768.75
85,290.40
June 30, 1940
951.36
116,841.45
June 30, 1941
202,312.02
112,171.35
June 30, 1942
138,701.16
51,593.85
June 30, 1943
(180,179.57)
98,766.45
June 30, 1944
197,154.65
53,984.80
June 30, 1945
158,148.77
49,470.40
June 30, 1946
1,360,875.73
46,104.60
June 30, 1947
280,758.01
40,712.80
June 30, 1948
254,878.79
56,394.90
June 30, 1949
216,156.79
112,120.20
June 30, 1950
80,556.00
103,721.40
*188 Prior to the death of Walter S. Case on October 5, 1937, the company owned investment securities having a market value of approximately $6,500,000 and maintained a large statistical staff, and active trading department, stock and commodity tickers and an extensive securities library. Upon the death of Walter S. Case, the company discontinued its statistical, research and trading departments, dismissing all the employees thereof; sold its investment library and surrendered its stock and commodity tickers. At about the same time, the company sold approximately $2,000,000 in value of marketable securities from the portfolio and with the proceeds of the sales retired its entire outstanding preferred stock. Readily marketable securities decreased from over $6,700,000 in 1936 to less than $1,900,000 in 1942 (both at market values). The annual dollar amount of purchases and sales has been reduced sharply since the death of Walter S. Case. After the death of Walter S. Case, there was a change in the policy and direction of the enterprise away from short-term speculation, in which it was engaged among other operations; it also gave up practically all of the world-wide features of the business *189 including interests in enterprises in Canadian mining situations and Australian mining ventures. Since that time it has concentrated upon oil exploration and production. After the death of Walter S. Case, the responsibility of management fell upon Hadley Case who became a director in 1937 soon after his father's death and president of the company in 1941 and has since remained its president. Waldron M. Ward has not been a director or officer of the company except for a brief period in 1929. Neither Mary Hadley Case nor Dorothy Case nor Donald S. Case nor Rosemary Case has at any time been a director or an officer of the company. Beginning with the fiscal year ended June 30, 1946, the company became a personal holding company as defined in Section 501 of the Internal Revenue Code and filed personal holding company returns for that and each taxable year thereafter. The testamentary trustees for the widow and the three children of Walter S. Case, and the Bank of New York as trustee for Donald S. Case and his issue, filed fiduciary returns for 1943 on or before March 15, 1944. The returns made by the testamentary trustees each included a statement in the following form (with variations *190 in the case of Donald due to the lesser number of shares sold): "During the year, the Fiduciary sold to Case, Pomeroy & Company, Inc., a Delaware corporation, with an office at 1 Cedar Street, New York City, 10,000 shares of its capital stock, pursuant to tenders invited by it. There was a long term capital loss on such sale amounting, as presently computed, to $22,750. The loss has not been entered among the deductions claimed in the return, as it may be deemed that the corporation was a controlled corporation and that the loss might therefore not be allowable under I.R.C. Section 24 (b). The Fiduciary, nevertheless, does not waive, but reserves, its right to the benefit of such deduction, if determined to be allowable." The respondent determined that the distributions made by the company to the trusts in 1943 when they surrendered a portion of its common stock had the effect of a taxable dividend and increased the amount of trust income reported by the petitioners in Docket No. 31579, and the amount of distributable trust income reported by petitioners in Docket Nos. 31580 and 31581 in their individual income and victory tax returns for 1943, by $67,500. The respondent made a similar *191 determination in Docket No. 31582, but limited the increase in the distributable trust income reported by Donald S. Case in his individual income and victory tax return for 1943, to $33,749.20. [2]
The payments by the company on June 19, 1943 to the petitioners in Docket No. 31579 and to the trustees for the benefit of the petitioners in Docket Nos. 31580, 31581 and 31582 for shares of its stock were not made at such time and in such manner as to make the distribution or redemption in whole or in part essentially equivalent to the distribution *192 of a taxable dividend. Opinion RAUM, Judge: The decisive question in these cases is whether the company's acquisition of its shares on June 19, 1943, at $6.75 a share is within Section 115 (g) of the Internal Revenue Code. [3] The question is predominantly one of fact. Did the company cancel or redeem its stock "at such time and in such manner as to make the distribution and cancellation or redemption * * * essentially equivalent to the distribution of a taxable dividend"? We think that it did not. The acquisition of the shares by the company was markedly out of proportion to the ownership of all its outstanding *193 shares. After such acquisition, the proportionate stock interests of Mary Hadley Case, Dorothy, Rosemary and Donald were substantially reduced, even after taking into account the shares which they owned individually or which were not part of the testamentary trusts. The percentages of ownership and reduction in ownership as a result of the company's June 19, 1943 purchase of its stock are shown in the following table: Reduction in
Before
After
ownership
Mary Hadley Case
Testamentary Trust
5.608
2.893
Shares individually owned
.431
.496
6.039
3.389
43.8%
Dorothy Case
Testamentary Trust
5.608
2.893
Shares individually owned
2.657
3.055
8.265
5.948
28.0%
Rosemary Case
Testamentary Trust
5.608
2.893
Shares individually owned
2.657
3.055
8.265
5.948
28.0%
Donald S. Case
Testamentary Trust
1.869
.964
1938 Trust for himself and lawful issue
1.870
.964
1938 Trust for Cornelia B. Case for life, re-
mainder to their lawful issue
1.870
.964
1936 Trust for himself
2.656
3.055
8.265
5.947
28.0% While it is true that it is not an indispensable prerequisite that a distribution to stockholders be pro rata in order to qualify as a taxable dividend, the fact that the payments for stock herein were so out of proportion to the total stockholdings raises *194 a serious question whether the payments were actually intended as or had the effect of being the substantial equivalent of a distribution of corporate earnings. Upon a study of the entire record we are satisfied that the transaction before us does not fall within Section 115 (g). There is present here a history of a prior sale of stock by the testamentary trustees to Hadley Case and of their unsuccessful effort to sell a substantial block of stock to Brewster. The sale to the company was, for practical purposes, nothing more than a comparable sale, leaving the trustees and the beneficiaries with a diminished stake in the corporate enterprise. Moreover, the record shows a rather consistent policy on the part of the corporation to buy stock from its stockholders, particularly where such purchase could be made advantageously, as was apparently the situation here. It would serve no useful purpose to review the entire record at this point. Suffice it to say, we have examined it carefully, and are satisfied that the payment for the shares surrendered here was in no sense the equivalent of the distribution of a taxable dividend. It was merely consideration for the stock which was surrendered. *195 The transaction was what it purported to be on its face. Decisions in Docket Nos. 31580 and 31582 will be entered for petitioners. Decisions in Docket Nos. 31579 and 31581 will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Mary Hadley Case; Dorothy Case O'Brian (formerly Dorothy Case); and Donald S. Case.↩
*. Market Value $2,341,105.00.↩
2. In the statement attached to the deficiency notice the respondent gave the following explanation of this adjustment: It has been determined that your distributable income for the taxable year 1943, as beneficiary of a trust created under the will of Walter S. Case, deceased, should be increased by $22,504.50, and that your distributable income under trust of Donald S. Case dated April 11, 1938, Bank of New York, et al., Trustees should be increased by $11,244.70, due to the surrender of shares of common stock of Case. Pomeroy & Company, Inc. which have the effect of taxable dividends as provided in section 115 (g) of the Internal Revenue Code↩.
3. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(g) Redemption of Stock. - (1) In General. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩